# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BREVARD EMERGENCY SERVICES,
P.A.,

                        Plaintiff,

-vs-                                                    Case No.  6:04-cv-1892-Orl-28JGG

EMCARE, INC., and HEALTHCARE
ADMINISTRATIVE SERVICES, INC.,

                        Defendants.
_____

## ORDER

This cause came on for consideration without oral argument on the following motions:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF TEXAS LAWYER R. BRENT COOPER, ESQ. (Doc. No. 72)** |
| **FILED:** | **June 15, 2006** |

**THEREON** it is **ORDERED** that the motion is **GRANTED**.

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF CHRISTOPHER TAIT (Doc. No. 74)** |
| **FILED:** | **June 15, 2006** |

**THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part.

This cause is before the Court on the parties' motions in limine to exclude the testimony of the

other party's expert witness.  Both motions are based upon *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993).  The Court  heard oral argument on the motion on August 14, 2006.  For the reasons stated below, the Court grants Plaintiff's motion to exclude the testimony of R. Brent Cooper, and grants in part and denies in part Defendants' motion to exclude the testimony of Christopher Tait.

## I.      BACKGROUND

Plaintiff Brevard Emergency Services, P.A. ("BES") is a group of emergency medicine physicians.  On February 3, 2003, BES entered into a Practice Service Agreement (Ex. A to Doc. 1) ("the Agreement") with Defendant Healthcare Administrative Services, Inc. ("Healthcare").  The Agreement describes Healthcare as being "in the business of providing comprehensive administrative and management services to physicians, professional corporations, and other professional health care entities and individuals and employs or retains contracts with personnel trained to provide such comprehensive management support services."  Ex. A to Doc. 1, at 1.  Defendant EmCare, Inc. ("EmCare") owns 100% of Healthcare, and also is alleged to be "the agent and/or servant of Healthcare."  Doc. 1 ¶¶ 10-11; Doc. 74 at 1 n.1.  EmCare allegedly negotiated with BES regarding the provision of services (Doc. 1 at 3), but the signatories on the Agreement are BES and Healthcare only.  Ex. A to Doc. 1, at 14.

The Agreement explains that BES "desires administrative and management services for its operations, and desires for [Healthcare] to provide such services to [BES] in connection with [BES'] contract . . . for the provision of emergency medical services and hospital services . . . at Holmes Regional Medical Center and Palm Bay Community Hospital."  Ex. A to Doc. 1, at 1.  The Agreement

-2-

lists nine services that Healthcare is to provide to BES, including "Insurance." Ex. A to Doc. 1, at 1-3.

As to "Insurance," the Agreement provides:

> **Insurance**.  In consideration for the compensation set forth herein, [Healthcare] shall obtain for [BES] and Group Providers professional liability insurance coverage, including coverage for any vicarious liability of Physicians arising from the utilization of MLPs, with limits of $1,000,000 per occurrence and $3,000,000 in the aggregate annually.  Such insurance shall cover Medical Services provided at the Health Center pursuant to the Health Center Contract, subject to the below, as well as other terms, conditions and exclusions contained in the insurance policy:
>
> > 1.     The insurance carrier providing coverage under Administrative Company's insurance program shall be rated "A-" or better by Best's at all times during the term of the Agreement[.]
> >
> > 2.     The program shall include coverage for the Emergency Medical Director's administrative duties in the above-stated limits.
> >
> > 3.     The program shall also include coverage for defense costs of government investigations of any covered Group Providers with limits of $25,000 per occurrence and $75,000 aggregate for each Group Provider.
> >
> > 4.     In order to remain eligible for such insurance coverage, Physician Group and each Group Provider shall at all times abide by the terms of this Agreement and shall fulfill the obligations set forth in Section II.C herein.
> >
> > 5.     If, in the sole discretion of [Healthcare], [BES] or an individual Group Provider fails to abide by the provisions of Section II.C herein, [Healthcare] may terminate this Agreement and/or the insurance coverage provided hereunder. [BES] may cure such breach by an Individual Group Provider under this Section by immediately terminating all employment or other [BES]-based professional and business relationships with such individual Group Provider and preventing such Group Provider from providing services hereunder.

Ex. A to Doc. 1, ¶ 1.B.

In a letter dated April 7, 2003, EmCare advised BES that a claims-made professional liability policy had been obtained for BES from CNA Insurance Company. Ex. C to Doc. 1. In that letter, EmCare explained that the policy provided coverage "for malpractice claims made against [BES] during the period beginning January 1, 2001 and ending January 1, 2004," and that "[a]s of January 1, 2004, and any subsequent year, 'tail' coverage will be purchased on the current CNA insurance policy covering the claims occurring during the above-referenced coverage period, or a new policy will be procured with CNA's retroactive date of January 1, 2001." *Id.*

In addition to the Agreement and the EmCare letter, there are two other attachments to the Complaint. A Certificate of Liability Insurance (Ex. B to Doc. 1) lists BES c/o Amy Adams, 1717 Main Street, #5200, Dallas, TX 75201[1] as the insured on claims-made policy number HAZ104002538-1 issued by Columbia Casualty Company. The Certificate of Insurance certifies that BES is insured to limits of $1,000,000 per incident and $3,000,000 aggregate. The Columbia Casualty Company policy itself (Ex. D to Doc. 1), however, lists only EmCare as the named insured, and insures to liability limits that are "shared by other corporate entities." EmCare argues that it was entitled to add an unlimited number of medical groups to the Columbia Casualty policy, and that EmCare had added BES to a list of additional named insureds that EmCare maintains. Docket No. 1 at 6. EmCare concedes that the Columbia Casualty Company policy covers hundreds of medical groups, and has a $10,000,000 shared annual aggregate and a $30,000,000 combined policy aggregate limit. Doc. 70

---

[1]BES denies knowing Amy Adams and states it has never had a Dallas, Texas address. The Dallas address listed for BES is actually EmCare's address. See Ex. D to Doc. 1.

-4-

at 1.  BES contends that it never agreed to a claims-made shared-aggregate policy, and that Healthcare

never informed BES that was the type of coverage procured.  Doc. 1, at ¶ 27.

BES's primary argument is that Healthcare breached the Agreement by failing to provide

"occurrence" type coverage for BES.  Doc 1, ¶ 38.  The Agreement does not specify the type of

insurance policy – claims-made or occurrence – to be procured.  Defendants contend that the claims-

made policy included tail "coverage," and satisfied Healthcare's obligations.  BES claims damages

for not having received the type of insurance it bargained for, and for an overcharge in premium due

to the type of insurance it actually received.  See Doc. 1 at ¶ 18 (alleging that market rates for claims-

made coverage was 30% less than what BES paid to Healthcare for occurrence coverage).  BES also

alleges that EmCare breached its agreement to provide at no charge a tail "policy" and that BES was

therefore required to purchase insurance elsewhere.  Doc. 1 at ¶¶ 47-48.  BES further alleges that

Defendants acted as BES's broker for the purpose of procuring insurance, and that Defendants

breached their fiduciary duty to BES by failing to procure an occurrence type policy, and by failing

to inform BES of all material facts.  Doc. 1at ¶ 52.  Finally, BES alleges that Defendants' actions

violated Florida's Deceptive and Unfair Trade Practices Act.  Doc. 1 at ¶¶ 54-59.

## II.    THE LAW

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data, (2)
> the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts
> of the case.

*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. 579, 589 n. 7, 597. As a gatekeeper, this court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 593-94. The Supreme Court has made it clear that *Daubert's* gatekeeping obligation applies to all expert testimony, not just scientific experts, and "reemphasized that an expert, whether basing testimony upon professional studies, or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Supreme Court set forth the following factors that are to be considered in determining the reliability of scientific expert testimony:

1)   whether the expert's technique or theory can be or has been tested;
2)   whether the technique or theory has been subject to peer review and publications;
3)   the known or potential rate of error of the technique or theory when applied;
4)   the existence and maintenance of standards and controls; and
5)   whether the technique or theory has been generally accepted in the scientific community.

*Daubert,* 509 U.S. at 593-94. The Court made clear that these factors were not to be rigidly applied, but were instead to serve as guidelines for federal district courts applying Rule 702. The Court said, "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one," *id.* at 594; "[m]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." *Id*. at 593.

The decision in *Kumho Tire* elaborated on the flexible nature of the inquiry. There the Court pointed out that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. Whether the *Daubert* factors are even

-6-

pertinent to assessing reliability in a given case will "depend[ ] on the nature of the issue, the expert's

particular expertise, and the subject of his testimony." *Id*. at 150 (internal marks omitted). Because the

applicability of the *Daubert* factors depends on the individual facts in a particular case, the Court said

that it could:

> neither rule out, nor rule in, for all cases and for all time the
> applicability of the factors mentioned in Daubert, nor [could it] now do
> so for subsets of cases categorized by category of expert or by kind of
> evidence. Too much depends upon the particular circumstances of the
> particular case at issue.

*Id.* at 150. This means that expert testimony that does not meet all or most of the *Daubert* factors may

sometimes be admissible.  The burden of establishing qualification, reliability and helpfulness rests

on the proponent of the expert opinion.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.

2004).

III.     **ANALYSIS**

    **A.     Motion to Exclude Cooper's Testimony**

    Defendants' proffered expert, R. Brent Cooper, is an attorney licensed to practice law in Texas.

He is a board certified personal injury trial lawyer, and his practice involves representing insurers and

insureds on matters relating to insurance coverage and bad faith.  Docket 77 at 2.  Cooper has

produced a five-page report, with his opinions set forth in approximately two pages.  Cooper's

opinions include the following:

    •     "Under insurance laws and principles, Columbia Casualty was still the carrier

responsible for any settlements or judgments.  It would then be up to Columbia to seek reimbursement

from EMCA as any ceding carrier would seek from a reinsurer."  Docket 77 at 4-5.

- "The terms of the Columbia policy allowed EmCare to write additional entities as insureds.  BES was added pursuant to the terms of the existing Columbia policy."  Docket 77 at 5.

- "Columbia is authorized to write surplus lines business in Texas.  The policy was written in Texas and a surplus lines tax was paid in Texas.  No additional tax was paid in Florida when BEF was added as an insurer.  The producer for the policy was McQueary, Henry, Bowles, Troy LLP."  Docket 77 at 5.

- "The assertion of BES that it somehow believed it was purchasing an occurrence policy is untenable.  The documents in the file from the very beginning indicate that the coverage to be provided to BES was a claims-made policy."  Docket 77 at 5.

- "[P]art of the premium charged for the Columbia coverage included the price to purchase tail coverage, i.e. coverage for claims reported after the conclusion of the relationship arising out of the term of the relationship.  Therefore, BES has no claim and no argument that somehow there was exposure that they were facing and had to address the termination of the PSA."  Docket 77 at 5.

- "[T]he inclusion of the tail coverage made the Columbia policy operate like an occurrence policy."  Docket 77 at 5.

- "[T]he policy was issued in Texas and [is] governed by Texas law."  Docket 77 at 5.

- "[A]ccording to the December 31, 2004, report filed with the Texas Department of Insurance, Columbia has over $124 million in assets and a surplus of over $120 million.  Its asset to liability ratio is 5,896 percent.  This percent is higher than most carriers writing insurance in the state of Texas or Florida."  Docket 77 at 5-6.

•      "[N]ot only did BES benefit from the financial wherewithal of Columbia, it also benefitted from the financial wherewithal of EMCA as the reinsurer of Columbia." Docket 77 at 6.

•      "The rates charged by Columbia Casualty reflect the financial risk for Columbia Casualty for use of its paper.  In addition, there is the additional insurance cost of procuring the reinsurance through EMCA which must be factored into the total cost of insurance for this particular program." Docket 77 at 6.

•      "The policy they [BES] received had more than adequate financial backing and responded properly to every claim that was presented.  Looking back, BES received everything that was promised and would have no colorable damages from this transaction." Docket 77 at 6.

Plaintiff objects to the admission of Cooper's testimony on the grounds that Cooper has never worked in the insurance business in Florida and lacks the necessary qualifications to render an opinion regarding Florida insurance issues.  Docket 72 at 2.  Because Cooper lacks specialized knowledge of Florida insurance practices, Plaintiff argues that Cooper's testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.  Plaintiff further argues that because contract interpretation is a question of law to be decided by the court, the Court does not need expert testimony but that fact witnesses will provide sufficient evidence.  Lastly, Plaintiff objects to Cooper's testimony to the extent it is a legal interpretation of the Practice Services Agreement.

Defendants respond that Cooper's opinions address principles and practices that are universal in the insurance industry and not unique to Florida.  Defendants argue that Cooper's roles as a lawyer,

-9-

consultant and expert witness[2] qualify him to testify regarding insurance practices.  Defendants further argue that Cooper's testimony will aid the trier of fact because insurance industry terminology is beyond the experience and understanding of the average person.  Finally, Defendants dispute that Cooper is providing a legal interpretation of the Practice Services Agreement, but rather that he is expressing an opinion on an ultimate issue of fact.  Indeed, Defendants claim that "not once does Cooper purport to interpret the law of Florida, or indeed any law."  Docket 77-1 at 9.

Cooper's report, however, clearly contains legal opinions.  He specifically refers to "insurance laws" when he opines that Columbia Casualty is the responsible carrier.  He also opines that the insurance policy is governed by Texas law.  Cooper also states a legal opinion in opining that the insurer "responded properly" to claims. At the oral argument, Defendants also emphasized that Texas law applied to the policy at issue and, therefore, having a person knowledgeable about Texas law would be helpful.  In the Eleventh Circuit, however, the judge is the only source of law.  *Konikov v. Orange County, Fla.*, 290 F. Supp. 2d 1315, 1318 (M.D. Fla. 2003).  It is the judge, not an expert, who "decides the content of the law, and instructs members of the jury on the applicability of the law to the facts of the case."  *Id*.  An attorney may not testify regarding the meaning of a law or the legal implications of conduct.  *Id.*

Beyond these legal opinions, Cooper's report reads, for the most part, like a lawyer's closing argument.  An expert must "bring to the jury more than the lawyers can offer in argument."  *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986).  Insurance terminology and

---

[2] It is unclear which courts have accepted Cooper as an expert and on what topics. The relevant pages from his deposition were not attached to the motion or response.  Although Defendants state Cooper has served as an expert in over a dozen cases, Cooper's curriculum vitae lists only two other cases in the last four years in which Cooper was deposed or testified as an expert.  Docket 77 at 25.

concepts are not so arcane that they cannot be explained adequately by a fact witness.[3]  Further, Defendants failed to prove that Cooper is qualified to render an expert opinion regarding such facts as insurance rates, how the price of insurance products are determined or asset to liability ratios. Cooper's testimony will do nothing to assist the trier of fact to understand the evidence or to determine a fact in issue.  Indeed, the primary purpose of his testimony appears to be to bolster counsel's closing arguments. Cooper's testimony, therefore, is excluded as inadmissible pursuant to Fed. R. Evid. 702.

> **B.     Motion to Exclude Tait's Testimony**

Plaintiff's proffered expert, Christopher Tait, is a consulting actuary.  Tait's opinions include the following:

•       "[T]he per-visit rate of $9.25 that [BES] paid to [EmCare] for Medical Professional Liability insurance with limits of liability of $1.0 million per claim / $3.0 million annual aggregate per physician is consistent with manual rates charged by The Medical Protective Company ("MedPro") for occurrence coverage for Emergency Room Physicians in Brevard County during 2003."  Docket 76-2 at 1.

•       "[A]djust[ing] to MedPro's 2003 manual rate for first-year claims-made coverage ($14,075) produces a per-visit rate of $2.61."  Docket 76-2 at 2.

•       "[A] tail policy providing $1.0 million per claim / $3.0 million annual aggregate per physician coverage . . . would have cost BES approximately $1.7 million."  Docket 76-2 at 2.

---

[3] At the hearing on the motion, Defendants also emphasized that Cooper would be helpful in explaining various aspects of Defendants' insurance "program."  Those opinions, however, were not contained in the report, and would be barred from introduction into evidence at trial.  See Case Management Scheduling Order, Docket 21 at 3("Expert testimony on direct examination at trial will be limited to the opinions, bases, reasons, data, and other information disclosed in the written expert report disclosed pursuant to this Order.").

When deposed, Tait testified that the per-visit rate comparison with MedPro led him to the conclusion that EmCare's policy was overpriced.

### 1. **Reliability of the Per-Visit Rate**

Defendants argue that Tait's methodology was fundamentally flawed and that his opinions are unreliable. Specifically, Defendants argue that Tait's methodology is flawed with respect to the per-visit rate because: 1) he only used one other company to conduct his comparison; and 2) his comparison was based on MedPro's manual rate, which is the standard rate that fails to take into account various risk factors such as claims history, quality of management, the existence of a risk management program and other intangible items. According to Defendants, Tait failed to calculate what MedPro would have actually charged Plaintiff because he did not have access to the claims histories of Plaintiff's physicians. Moreover, Tait was not an underwriter and did not know how an underwriter would have priced the policy. Defendants further argue that Tait's opinion is unreliable because it was based on the assumption that the per-visit charge under the EmCare policy was for insurance coverage only and did not include charges for access to other services available under the Agreement.

Plaintiff responds that the rate it was charged was based on a "regional rate" and not specific underwriting inputs. Therefore, Tait's failure to account for underwriting inputs does not affect the reliability of his data. Also, Plaintiff states that the $9.25 per-visit rate did not include other administrative services. Plaintiff points out that the PSA provides a separate fee of $2.40 per patient visit to cover administrative support, and specifically states "[f]or the professional liability insurance furnished by Administrative Company hereunder, the Physicians Group agrees to pay to

-12-

Administrative Company an amount equal to Nine Dollars and Twenty-five Cents ($9.25) for each Emergency Department patient visit and Three Dollars and Seventy Cents ($3.70) for each Hospitalist [sic] patient visit. . . ."  Docket 1, Exh. A at 4.

There is a sufficient factual basis for Tait to opine that the amount paid by BES to EmCare for claims-made coverage is consistent with manual rates charged by MedPro for occurrence coverage. Comparison to one other insurance provider, however, is an insufficient sampling to support the general conclusion, which Plaintiff apparently will argue in closing, that BES was overcharged for the claims-made coverage received from EmCare.  Furthermore, Tait does not opine that BES qualified for the MedPro manual rate.  Therefore,  the comparison to MedPro rates is not helpful to the trier of fact.  The testimony, therefore, is excluded.

2.    **Reliability of the Conversion Rate**

Defendants also argue that the conversion factor that Tait used to calculate MedPro's per-visit rate is unreliable because it was not based on the factor that MedPro used, but rather on a factor used by an entirely different company.  Plaintiff responds that MedPro did not have a conversion factor to calculate the per-visit rate, therefore, Tait used the conversion factor used by First Professional Insurance Company (FPIC), which Defendants assert is the largest insurance underwriter in the State of Florida.  Plaintiff argues that because the conversion factor is simply an estimate of the number of patients that an average emergency doctor sees in a year, and has nothing to do with the actual rate charged, it has little effect upon the proffered calculations.

The conversion rate clearly effects Tait's calculation of the per-visit rate for claims-made coverage.  Although FPIC may be the largest insurance underwriter in Florida, there is no showing

-13-

that FPIC's statistical average of 5,400 patients treated annually by a full-time emergency department physician is comparable to the number of patients treated by BES' physicians.  Without some factual basis to establish the appropriateness of comparing BES' experience to that of FPIC insureds, Tait's use of the 5,400 conversion figure to calculate the per-visit rate for claims-made coverage is speculative.  Tait's opinion that MedPro's manual rate for first- year claims made coverage equals a per-visit rate of $2.61is not sufficiently reliable.  This testimony, therefore, is excluded.

3.      <strong><u>Reliability of Cost of Replacement Tail Coverage</u></strong>

Defendants do not challenge Tait's methodology in estimating the price of a tail premium by using an average of the 2004 manual rates for three different insurers.  Rather, Defendants argue that Tait's opinion that it would have cost Plaintiff $1.7 million for a tail policy is not helpful because: 1) Plaintiff actually purchased a tail policy, therefore, the actual amount of alleged damages is known; and 2) Tait's opinion is based on a simple mathematical calculation within the reach of the average juror.[4]

The parties dispute what constitutes a tail policy.  After terminating its Agreement with Defendants, Plaintiff purchased a new claims-made policy with a prior acts retroactive date at a cost of $608,698 for a period of seven months.  In Defendants' view, such a policy is a "tail policy;" Plaintiff says it is not.

Defendants' have made conflicting arguments regarding how Plaintiff's purchase of the subsequent policy should be treated.  On the one hand, Defendants argue in their papers that the Court should exclude Tait's opinion regarding the costs of a tail policy because the cost of the tail coverage

---

[4] Tait bases his opinion on averaging the rates charged by three different companies.  Ex. A to Doc. 74.

-14-

purchased by Plaintiff is known.  At the hearing, however, Defendants argued that the retroactive date portion of a new claims-made policy comprises only a small amount of the overall cost of the policy. Therefore, the actual cost of the coverage subsequently procured by Plaintiff remains unknown. Plaintiff argued at the hearing that it cannot now obtain the type of tail policy that Defendants promised because insurers no longer write those policies in Florida.

Plaintiff also argued that the policy it did obtain had lower limits than the promised policy. The value of the tail policy that Defendants allegedly failed to provide is relevant to Plaintiff's damages claim.  Even if the calculations used by Tait are simple, Tait's research and opinion as to the cost of tail policies to Florida insureds may be helpful to the trier of fact.  Tait, therefore, may testify regarding the cost of tail policies that might have been available to Plaintiff.

**DONE** and **ORDERED** in Orlando, Florida on August 21, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

-15-